# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-60286 consolidated with
No. 13-60481

United States Court of Appeals
Fifth Circuit

**FILED**
September 17, 2014

Lyle W. Cayce
Clerk

ACADIA INSURANCE COMPANY,

Plaintiff - Appellee,

v.

HINDS COUNTY SCHOOL DISTRICT,

Defendant Cross Claimant - Appellant,

v.

ACE AMERICAN INSURANCE COMPANY,

Cross Defendant - Appellee

BRYANT COWARD; ET AL,

Plaintiffs,

v.

HINDS COUNTY SCHOOL DISTRICT,

Defendant - Appellant,

v.

ACE AMERICAN INSURANCE COMPANY,

Defendant - Appellee

Nos. 13-60286 cons. w/13-60481

Appeals from the United States District Court
for the Southern District of Mississippi
USDC No. 3:12-CV-188

Before DAVIS, SMITH, and CLEMENT, Circuit Judges.

PER CURIAM:*

This case involves the scope of two different insurers' obligations to defend and indemnify Hinds County School District ("HCSD") with respect to the Coward family's claims. The two insurers are called Ace American and Acadia. Both insurers filed motions for summary judgment arguing that their respective insurance policies did not cover the Coward family's claims. The district court granted both motions. The district court also denied HCSD's motion for leave to amend its pleading to include a counterclaim against Acadia for a breach of the duty of good faith and fair dealing.

As explained below, we affirm the district court's grant of Ace American's motion for summary judgment. By contrast, we reverse the district court's grant of Acadia's motion for summary judgment. Finally, we affirm the district court's denial of HCSD's motion for leave to amend because its proposed counterclaim against Acadia would have been futile.

I.

The Coward family's daughter, M.L.C., is confined to a wheelchair and lacks control over her arms. The Coward family alleges that while incapacitated, M.L.C. was injured between 2008 and 2009 by a schoolteacher, Louise Miley Johnston, who was employed by HCSD. According to the Coward

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

family, Johnston dropped M.L.C. out of her wheelchair on at least one occasion. Based on this incident and a number of other acts allegedly committed by Johnston, the Coward family brought claims against HCSD under Mississippi tort law and 42 U.S.C. § 1983. The Coward family's lawsuit is still pending before the district court. In the present appeal, HCSD argues that two insurers, Ace American and Acadia, are obliged to defend and indemnify HCSD as to the Coward family's claims.

The first insurer, Ace American, insured HCSD under Scholastic Advantage Educators Legal Liability Policy No. EON G23640806 001 ("Ace American Policy"). This insurance policy sets forth a number of exclusions, one of which states that "the Insurer shall not be liable for Damages or Claims Expenses on account of any Claim . . . alleging, based upon, arising out of or attributable to any . . . Bodily Injury, other than Mental Distress arising out of a Wrongful Employment Practice." In its order of June 13, 2013, the district court concluded that although the Coward family's claims for bodily injury did include claims for "Mental Distress," such claims did not "aris[e] out of a Wrongful Employment Practice." The district court therefore reasoned that the Ace American Policy did not cover the allegations in the Coward family's lawsuit and Ace American had no duty to defend HCSD under Mississippi law.

The second insurer, Acadia, insured HCSD during the relevant time under Commercial General Liability Policies CNA 4235393-11 and CNA 4235393-12 ("Acadia Policy"), the relevant provisions of which are identical. In its order of March 29, 2013, the district court concluded that the Coward family's claims fell outside the scope of the Acadia Policy for three reasons.

First, the Acadia Policy provides that any covered "bodily injury" must be the consequence of an "occurrence," which the policy further defines as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." As the district court explained, discovery had

Nos. 13-60286 cons. w/13-60481

produced "no evidence" that M.L.C.'s drop from the wheelchair was accidental, rather than the result of an intentional act by Johnston.

Second, the Acadia Policy also excludes from coverage any "expected or intended" injury and any injury arising from "abuse or molestation." According to the district court, however, the Coward family alleged "a pattern of *abuse*, which is intentional conduct." The Coward family's claims were therefore excluded from coverage under these provisions of the Acadia Policy as well.

Third, the district court found that the Coward family was unable to prove any "bodily injury" that would be covered by the policy. As the district court acknowledged, "the plaintiffs certainly alleged in their complaint that M.L.C. had suffered a variety of bodily injuries . . . ." The record, however, contained "no evidence about treatment by doctors for physical injuries or any physical limitations M.L.C. will suffer from the alleged abuse. . . . Any physical injuries she suffered must be inferred from the fact that she fell to the ground, and even then they appear to be *de minimis*." Accordingly, the district court concluded that Acadia was entitled to summary judgment based on the absence of evidence regarding M.L.C.'s injuries.

HCSD appealed the district court's orders granting summary judgment in favor of Ace American and Acadia. We consolidated HCSD's two appeals and consider each in turn.

## II.

This court reviews a district court's order granting or denying summary judgment de novo, applying the same standards as the district court.[1] Summary judgment is proper under Rule 56 of the Federal Rules of Civil Procedure if the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations" and other

---

[1] *ACS Constr. Co., Inc. of Miss. v. CGU*, 332 F.3d 885, 887-88 (5th Cir. 2003).

Nos. 13-60286 cons. w/13-60481

materials do not establish a "genuine dispute as to any material fact."

We look to state law for rules governing contract interpretation.[2] Under Mississippi law, an insurance policy is subject to the general rules of contract interpretation.[3] In Mississippi, construction of an insurance policy presents a question of law, which we review de novo.[4]

The duty of an insurance provider to defend its insured depends upon the language of the policy.[5] "'The traditional test' for whether an insurer has a duty to defend under the policy language 'is that the obligation of a liability insurer is to be determined by the allegations of the complaint or declaration'" in the underlying action.[6] If the factual allegations in an underlying complaint state a claim that is within or arguably within the scope of coverage provided by a policy, then the insurance provider is obligated to defend the insured.[7] Additionally, as held by the Supreme Court of Mississippi in *Automobile Insurance Co. of Hartford v. Lipscomb*, 75 So. 3d 557, 559 (Miss. 2011), "the insurer must provide a defense until it appears that the facts upon which liability is predicated fall outside the policy's coverage." In Mississippi, therefore, an insurer is relieved of its duty to defend where "no genuine issue of material fact" remains as to coverage based on the "language of the policy, the complaint, and the relevant deposition testimony."[8]

"'[T]he duty to defend is broader than the insurer's duty to indemnify

---

[2] *F.D.I.C. v. Firemen's Ins. Co. of Newark, NJ*, 109 F.3d 1084, 1087 (5th Cir. 1997).

[3] *See Clark v. State Farm Mut. Auto. Ins. Co.,* 725 So. 2d 779, 781 (Miss. 1998); *Essex Ins. Co. v. Greenville Convalescent Home Inc.*, 236 F. App'x 49, 50-51 (5th Cir. 2007).

[4] *State Farm Mut. Auto. Ins. Co. v. LogistiCare Solutions, LLC*, 751 F.3d 684, 688 (5th Cir. 2014) (citing *Farmland Mut. Ins. Co. v. Scruggs*, 886 So. 2d 714, 717 (Miss. 2004)).

[5] *Delta Pride Catfish, Inc. v. Home Ins. Co.*, 697 So. 2d 400, 403 (Miss. 1997).

[6] *Id.* (quoting *State Farm Mut. Auto. Ins. Co. v. Taylor*, 233 So. 2d 805, 808 (Miss. 1970)).

[7] *Ingalls Shipbuilding v. Fed. Ins. Co.*, 410 F.3d 214, 225 (5th Cir. 2005); *Am. Guar. & Liab. Ins. Co. v. 1906 Co.*, 273 F.3d 605, 610 (5th Cir. 2001).

[8] *Lipscomb*, 75 So. 3d at 560-61.

under its policy of insurance: the insurer has a duty to defend when there is any basis for potential liability under the policy.'"[9] But "[u]nlike the duty to defend, which can be determined at the beginning of the lawsuit, an insurer's duty to indemnify generally cannot be ascertained until the completion of litigation, when liability is established, if at all."[10] "This is because, unlike the duty to defend, which turns on the pleadings and the policy, the duty to indemnify turns on the actual facts giving rise to liability in the underlying suit, and whether any damages caused by the insured and later proven at trial are covered by the policy."[11]

## III.

We affirm the district court's order of June 13, 2013, for essentially the reasons stated in the district court's opinion. Reading the Ace American Policy as a whole, the only claims for bodily injury covered under the Ace American Policy are claims for mental distress experienced by an employee or applicant for employment due to the actions of the employer. Because M.L.C. is not HCSD's employee, her injuries do not arise from a "Wrongful Employment Practice" under the Ace American Policy.

The Ace American Policy excludes coverage for bodily injury "other than Mental Distress arising out of a Wrongful Employment Practice." The insurance policy further explains that a "Wrongful Employment Practice" must be predicated on one of thirteen injurious activities. Nearly all of the thirteen injurious activities can logically arise only out of the employment relationship: "wrongful dismissal," "employment-related misrepresentation," "wrongful

---

[9] *LogistiCare*, 751 F.3d at 692; *Titan Indem. Co. v. Pope*, 876 So. 2d 1096, 1101 (Miss. App. 2004) (quoting *Merchants Co. v. Am. Motorists Ins. Co.*, 794 F. Supp. 611, 617 (S.D. Miss. 1992)).

[10] *LogistiCare*, 751 F.3d at 692 (quoting *Estate of Bradley v. Royal Surplus Lines Ins. Co.*, 647 F.3d 524, 529 (5th Cir. 2011)).

[11] *Id.*

deprivation of a career opportunity," "wrongful demotion," "failure to employ or promote," "employment-related libel," "defamatory statements in connection with an Employee reference," and "failure to grant tenure." Other items on this list are identified using more general terms, such as "discrimination" and "retaliation," but even these terms are elsewhere defined in the policy to include only injuries to employees or applicants for employment. "Discrimination," for example, is defined specifically to include only "actual or alleged violation of employment discrimination laws."

In arguing that the Coward family has alleged a claim based on a "wrongful employment practice" under the Ace American Policy, HCSD has focused on only a single injurious activity from the list of thirteen: "negligent evaluation." According to HCSD, the Coward family has alleged that HCSD negligently gave the schoolteacher, Johnston, positive performance evaluations. These negligently positive evaluations thereby enabled her to remain in the classroom where she could cause mental distress to students.

We reject HCSD's argument. In Mississippi, the interpretive principle of *ejusdem generis* applies both to contractual interpretation as well as to statutory construction.[12] According to this principle, general words listed among an enumeration of specific words "are construed to embrace only those objects similar in nature to those objects enumerated by the . . . specific words."[13] The fact that nearly all of the items on the Ace American Policy's list of wrongful employment practices could only logically be injurious to an employee suggests that "negligent evaluation" should be construed in this way as well.

This conclusion is supported by the Ace American Policy when it is read

---

[12] *See Morgan v. State ex rel. Dist. Atty.*, 44 So. 2d 45, 48-49 (1950); *City of Hernando v. N. Mississippi Util. Co.*, 3 So. 3d 775, 787 (Miss. Ct. App. 2008).

[13] *Flye v. Spotts*, 94 So. 3d 240, 245 (Miss. 2012) (citation omitted).

7

"as a whole," as required under Mississippi law.[14]  The Ace American Policy defines damages "arising out of a Wrongful Employment Practice" to include "front pay and back pay," as well as "liquidated damages awarded pursuant to the Age Discrimination in Employment Act of 1967 or the Equal Pay Act of 1983," but not "employment-related benefits, retirement benefits, perquisites, vacation and sick days . . . provided, however, this limitation does not include salary, wages, bonuses, commissions and non-deferred cash incentive compensation . . . ."  These detailed provisions, which are only relevant in the context of an employment relationship, suggest that the term "Wrongful Employment Practice" was not intended to encompass injuries arising from the teacher-student relationship.

Finally, this interpretation finds further confirmation in the blanket exclusion for all bodily injury other than mental distress.  Young students such as M.L.C., after all, are obviously more likely to experience a bodily injury than a deprivation of back-pay or retirement benefits.  It is evident, therefore, that young students were not contemplated as potential victims of "negligent evaluation" or any other wrongful employment practice under the Ace American Policy.

For these reasons, the district court was correct to conclude that the Coward family's lawsuit is not covered by the Ace American Policy and, therefore, that Ace American has no duty to defend HCSD.[15]  Accordingly, the district court's order granting summary judgment on June 13, 2013, is affirmed.

### IV.

We reverse the district court's order of March 29, 2013, with respect to

---

[14] *See Cherry v. Anthony, Gibbs, Sage*, 501 So. 2d 416, 419 (Miss. 1987) (citing *Hinds Motor Co. v. Hederman*, 30 So. 2d 70, 72 (Miss. 1947)).

[15] *See Delta Pride*, 697 So. 2d at 403.

Nos. 13-60286 cons. w/13-60481

Acadia's duties to defend and indemnify. As explained above, the parties dispute primarily whether Johnston's alleged conduct constitutes an "occurrence" that falls within the terms of the Acadia Policy. In the leading cases, *Allstate Ins. Co. v. Moulton*, 464 So. 2d 507, 510 (Miss. 1985), and *U.S. Fidelity & Guaranty Co. v. OmniBank*, 812 So. 2d 196, 198-200 (Miss. 2002), the Supreme Court of Mississippi held that insurance for injury caused by an "occurrence" is triggered only by "accidental" conduct. As explained in *OmniBank*, 812 So. 2d at 201, "a claim resulting from intentional conduct which causes foreseeable harm is not covered [by the term, 'occurrence'], even where the actual injury or damages are greater than expected or intended."

We therefore begin our consideration of Acadia's duty to defend based on whether Johnston's alleged conduct was accidental or intentional. As demonstrated in *Lipscomb*, 75 So. 3d at 559-61, the Mississippi courts' analysis of the duty to defend may take into account materials in the record outside the complaint and the insurance policy. In that case, the Supreme Court of Mississippi looked to the "language of the policy, the complaint, and the relevant deposition testimony" to determine whether the insurer possessed a duty to defend the insured against a lawsuit arising from a fire in an apartment building.[16] In particular, the insurance policy in *Lipscomb*, 75 So. 3d at 559-61, excluded injuries "[a]rising out of or in connection with a business engaged in by any insured," as well as injuries "[a]rising out of the rental or holding for rental of any premises" that were not found specifically at "an insured location." As the Supreme Court of Mississippi explained, the insured's own deposition testimony revealed affirmatively that the insured "was operating a business," that the insured's "source of income at the time of the fire was his rental properties," and that the apartment building was not an insured rental

---

[16] *Lipscomb*, 75 So. 3d at 560-61.

property.[17]  Accordingly, because "no genuine issue of material fact" existed regarding the applicability of the insurance policy's exclusions, the Supreme Court of Mississippi held that the insurer had no duty to defend Lipscomb against the underlying claims.[18]

Here, by contrast, a genuine issue of material fact does exist with respect to the applicability of the exclusions in the Acadia Policy.  In particular, the Coward family alleged that Johnston dropped M.L.C. out of her wheelchair and onto the ground.  This allegation is supported by the written statement of Larina Mason, a physical therapist who worked with Johnston's students.  Although Mason's statement is ambiguous, we are obliged to construe the evidence and draw all reasonable inferences in the non-movant's favor at the summary judgment stage.[19]  In conducting our present analysis, therefore, we must draw the reasonable inference based on Mason's written statement that M.L.C.'s fall from the wheelchair was unintended and accidental.

Mason's written statement contains a number of criticisms regarding Johnston's attitude of disrespect toward Mason, the other therapists, Johnston's own teaching assistants, and the students.  Only the first paragraph, however, is actually relevant to the incident where M.L.C. was dropped from her wheelchair:

> On 9/08/2008 an incident occurred when I asked for assistance to get [M.L.C.] out of her wheelchair and onto a mat on the floor. While I had my back turned putting on gloves, I heard a thud. When I turned around [M.L.C.] was lying on the floor on the mat. Kourtney (assistant in classroom) had transferred her without any help. She commented, "She's alright.  I'm not going to hurt my back bending over."  I did not <u>see</u> her drop [M.L.C.] on the mat, but by her response and the look on Ms. Johnston's face and the look

---

[17] *Id.* at 560 & n.9.

[18] *Id.* at 559-61.

[19] *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 651 (5th Cir. 2004) (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000)).

Nos. 13-60286 cons. w/13-60481

on [M.L.C.'s] face, I know she didn't transfer her appropriately.

This paragraph is ambiguous, and the parties have parsed it very differently. According to Acadia, this paragraph means that "Kourtney's act of dropping M.L.C. . . . was not an accident, but was intentionally done by Kourtney to keep her from hurting her own back." According to HCSD, Mason's statement is "couched in terms of negligence," which "supports Plaintiffs' allegation" that the wheelchair incident was "accidental and/or negligent." It is also evidently the Coward family's understanding, based on their complaint in the underlying lawsuit, that it was not HCSD's assistant teacher, Kourtney, but rather "Ms. Johnston" who "dropped M.L.C." on this occasion.[20]

Fairly read, this ambiguous paragraph would support any of these

---

[20] It is worth acknowledging that the Coward family's complaint does not mention Kourtney, but rather attributes responsibility for dropping M.L.C. solely to Johnston. Given the ambiguities in Mason's written statement, however, we think that the Coward family's complaint could hypothetically withstand summary judgment even based on its allegation regarding Johnston. Whatever the most elegant reading of Mason's written statement might be, it is at least a reasonable inference that Mason was referring to Johnston rather than Kourtney when she wrote, "I know she didn't transfer her appropriately" after M.L.C. was transferred "without any help."

In any event, we are not faced at present with a motion for summary judgment against the Coward family. In this appeal, we are evaluating only Acadia's duty to defend, and Acadia has never once argued that coverage is excluded because Johnston, rather than Kourtney, was the HCSD employee identified in the Coward family's complaint. *See* Acadia Br. 44. The reason is clear enough: Kourtney was also an employee of HCSD. As provided under *Lipscomb*, 75 So. 3d at 559, the Mississippi courts' analysis of the duty to defend takes into account not just the allegations in the complaint, but also "the true facts" of which "an insurer becomes aware" through "independent investigation." If Kourtney, rather than Johnston, was revealed by Acadia's investigation to be responsible for dropping M.L.C., then HCSD is potentially liable under the same agency theory invoked by the Coward family as to Johnston. At least as described in Mason's written statement, both Johnston and Kourtney were apparently acting within the scope of their employment as HCSD's teacher and assistant teacher when they transferred (or failed to transfer) M.L.C. from her wheelchair. *Estate of Brown By & Through Brown v. Pearl River Valley Opportunity, Inc.*, 627 So. 2d 308, 311 (Miss. 1993) ("[A]n injury arises out of an employment when . . . there is a causal connection between such injury and the conditions under which the work is required to be performed."); *see also Cockrell v. Pearl River Valley Water Supply Dist.*, 865 So. 2d 357, 361-62 (Miss. 2004). The identity of the HCSD employee who allegedly dropped M.L.C., therefore, has no consequences in the present appeal.

11

proposed interpretations. In particular, because Mason's written statement describes an incident involving three female individuals, it is difficult to tell for certain who is being described by each use of the pronouns, "she" and "her." Kourtney may have dropped M.L.C. to avoid hurting her (Kourtney's) own back and then told Mason that she (M.L.C.) was "alright" (meaning uninjured). Or Kourtney may have been describing Johnston as "alright" (meaning blameless), because her (Johnston's) help wasn't actually required to transfer M.L.C. from the wheelchair. Or Johnston might have been the "she" who commented that Kourtney was "alright" (meaning capable of performing the task by herself), which was why Johnston left Kourtney to perform the transfer "without any help" rather than hurting her (Johnston's) own back.

In other words, the written statement is ambiguous. Where the evidence is "at least ambiguous" with respect to a material issue of fact, as we stated in *Carroll v. Metropolitan Ins. & Annuity Co.*, 166 F.3d 802, 807 (5th Cir. 1999), summary judgment must be denied. Here, "[g]iven the ambiguities in the record, the parties' conflicting versions of the facts, and the competing factual inferences arising from this muddle, the only thing clear is that the appellee could not properly obtain summary judgment on this point."[21] Although Mason's written statement is difficult to follow, it does support the reasonable inference that M.L.C. fell from the wheelchair because of accidental conduct by either Johnston or Kourtney. Accordingly, Acadia is not relieved of its duty to defend HCSD based on the term, "occurrence," in the Acadia Policy or the exclusion for "intended" injury.

Mason's statement also prevents summary judgment based on the Acadia Policy's exclusion for "abuse or molestation." All of the Mississippi

---

[21] *Impossible Elec. Techniques, Inc. v. Wackenhut Protective Sys., Inc.*, 669 F.2d 1026, 1032 (5th Cir. 1982); *see also Bailey v. O'Donnell*, 980 F.2d 1445, at*2 (5th Cir. 1992).

decisions cited by the parties have applied "abuse or molestation" exclusions either to sexual conduct[22] or to plainly intentional conduct.[23] Accordingly, if M.L.C. were dropped from her wheelchair accidentally and unintentionally, this would not necessarily be excluded as "abuse" under the Acadia policy. Because "the insurer has a duty to defend when there is any basis for potential liability under the policy"[24] under Mississippi law, the duty to defend is therefore triggered in this case.[25]

Conversely, the fact that the Coward family has explicitly alleged that Johnston subjected M.L.C. to a pattern of "abuse" does not relieve Acadia of the duty to defend. Most critically, under Mississippi law, "[i]n comparing the complaints with the policy terms, we look not to the particular legal theories pursued by the state complainants, but to the allegedly tortious conduct underlying their suits."[26] Accordingly, even if the Coward family were to characterize a non-abusive act as "abuse," the Coward family's characterization would not be dispositive of Acadia's duty to defend under Mississippi law. Moreover, the Coward family's complaint does not necessarily include the wheelchair incident within Johnston's alleged pattern of abuse. Apart from the wheelchair incident, the Coward family has also alleged that Johnston committed numerous other injurious acts.[27] The complaint also

---

[22] *See, e.g.*, *Lincoln Cnty. Sch. Dist. v. Doe*, 749 So. 2d 943, 945 (Miss. 1999); *Titan Indem. Co. v. Williams*, 743 So. 2d 1020, 1022 (Miss. Ct. App. 1999); *see also Cincinnati Ins. Co. v. Markel Am. Ins. Co.*, CIVA 307CV168-WHBLRA, 2008 WL 2415248, at *11 (S.D. Miss. June 11, 2008); *Am. Nat. Gen. Ins. Co. v. L.T. Jackson*, 203 F. Supp. 2d 674, 678 (S.D. Miss. 2001).

[23] *See Maryland Cas. Co. v. Nestle*, 1:09 CV 644-LG-RHW, 2010 WL 3735756, at *1 (S.D. Miss. Sept. 17, 2010).

[24] *Titan Indem.*, 876 So. 2d at 1101.

[25] *See Delta & Pine Land Co.*, 530 F.3d at 399 ("As long as the claim is 'arguably' covered by the insurance policy, the duty to defend is triggered.").

[26] *Am. Guar. & Liab. Ins. Co.*, 273 F.3d at 610.

[27] As alleged by the Coward family, the schoolteacher also (1) "use[d] unnecessary force" to prevent M.L.C. "from flapping her arms," (2) "struck" M.L.C. "when she was tying

repeatedly attributes M.L.C.'s injuries to "negligent and grossly negligent acts or omissions." Construing the complaint in favor of the non-movant, HCSD, it is therefore reasonable to conclude that Johnston allegedly committed both a pattern of abusive acts and at least a single non-abusive act when M.L.C. was dropped from her wheelchair.

Additionally, the district court erred by granting summary judgment based on the absence of any "evidence about treatment by doctors for physical injuries or any physical limitations M.L.C. will suffer from the alleged abuse." The present case is not an instance such as *Lipscomb*, 75 So. 3d at 559-61, in which deposition testimony affirmatively demonstrated that coverage was excluded under the "rental property" exclusion contained in the applicable insurance policy. Nor is this an instance such as *State Farm Mutual Auto. Ins. Co. v. LogistiCare Solutions, LLC*, 751 F.3d 684, 692-93 (5th Cir. 2014), where the written interrogatories likewise affirmatively demonstrated that the insured received payment for the use of a vehicle and thus fell within the applicable insurance policy's "for a charge" exclusion.

Here, the district court consulted the record not with respect to an affirmative demonstration that coverage was excluded, but with respect to the absence of evidence. Such an analysis of the duty to defend apparently has no basis in any Mississippi case law. Indeed, such an analysis of the duty to defend would be fundamentally unfair to the insured. It is, after all, not the insured who is obliged to bring forward evidence of the plaintiff's injury, but the plaintiff. Even if the Coward family has not yet produced evidence of physical injury, they may yet be able to do so during the ongoing proceedings

---

her feet to the foot rest," (3) threw a ball at M.L.C.'s face, (4) sprayed M.L.C.'s face with a can of aerosol body spray, (5) grabbed M.L.C.'s face, and (6) was verbally cruel and abusive to M.L.C. on many occasions. *See* Complaint ¶ 10 (Case No. 3:12-cv-188, Rec. Doc. 14-1); Complaint ¶¶ 9-12 (Case No. 3:12-cv-188, Rec. Doc. 14-5); Amended Complaint ¶ 9 (Case No. 3:12-CV-731, Rec. Doc. 1-1).

14

before the district court.  As for the complaint itself, as the district court acknowledged, "the plaintiffs certainly alleged in their complaint that M.L.C. had suffered a variety of bodily injuries."  Accordingly, the district court should not have concluded that Acadia was entitled to summary judgment based on the absence of evidence regarding bodily injury.

Finally, with respect to the duty to indemnify, our decision in *Barden Mississippi Gaming LLC v. Great Northern Ins. Co.*, 576 F.3d 235, 239-40 (5th Cir. 2009), explained that the duty to indemnify usually should not be evaluated "until the resolution of [the underlying claimant's] lawsuit." Similarly, as we explained in *Essex Ins. Co. v. Greenville Convalescent Home Inc.*, 236 F. App'x 49, 52 (5th Cir. 2007) (citing *Green v. Aetna Ins. Co.*, 349 F.2d 919, 923-26 (5th Cir. 1965)), "[a]ny associated legal questions regarding coverage will be informed by the results of the trial, and the resolution of these questions should also await its conclusion."  Given the particular ambiguity surrounding the key piece of evidence in this case—Mason's written statement—the usual rule regarding the duty to indemnify should be applied here.  As compared with speculation about what the Coward family will or will not be able to demonstrate, or what Mason's ambiguous written statement might have meant, the evidence actually produced at trial will provide a firmer basis on which to judge whether Acadia must indemnify HCSD under the Acadia Policy.

V.

Turning to HCSD's counterclaim, the district court did not abuse its discretion by denying HCSD leave to amend its pleading under Rule 15 of the Federal Rules of Civil Procedure.  Such leave should not be granted if the proponent of the amendment fails to state a claim upon which relief may be

granted.[28]

Invoking the duty of good faith and fair dealing, HCSD argues that Acadia had an obligation to provide "indemnity settlement authority" for the purposes of a mediation on June 20, 2012, to HCSD's *Moeller* counsel, who represents the interests of the insured under *Moeller v. American Guarantee and Liability Insurance Co.*, 707 So. 2d 1062 (Miss. 1996). In HCSD's view, its attorney should have been authorized to settle the Coward family's claims not only on behalf of HCSD, but also on behalf of Acadia.

HCSD cites no authority, however, that would support this argument. Indeed, as is illustrated by *Twin City Fire Insurance Co. v. City of Madison, MS*, 309 F.3d 901 (5th Cir. 2002), the insured's decision to settle and the insurer's decision to settle are ordinarily two independent decisions in Mississippi.[29] The bad faith alleged in that case involved the insurer's improper use of privileged information regarding the insured, which had been obtained by the insurer through the insured's *Moeller* counsel in order to "develop [the insurer's] position of non-coverage."[30] There is no similar allegation in the present case. There is no suggestion that HCSD's *Moeller* counsel improperly transmitted any of HCSD's confidential information to Acadia to help Acadia prepare its case.

Indeed, the duty that HCSD proposes would appear to create a conflict of interest. Under Mississippi law, the *Moeller* counsel is required to act in the interests of the insured. But HCSD's theory would vest *Moeller* counsel with

---

[28] *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014); *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 872-73 (5th Cir. 2000).

[29] *Twin City Fire*, 309 F.3d at 904 ("The [plaintiffs] settled their claims with [the insured] for $250,000. *In a separate agreement* with [the insured], [the insurer] agreed to pay the settlement amount to the [plaintiffs], *reserving its right to seek recoupment* from [the insured] in this declaratory judgment action.") (emphasis added).

[30] *Id*. at 905-06.

16

Nos. 13-60286 cons. w/13-60481

authority to make binding decisions on behalf of the insurer, whose interests—as the Supreme Court of Mississippi recognized in *Moeller*, 707 So. 2d at 1070—may be adverse to the interests of the insured.

We therefore decline HCSD's invitation to recognize any duty for the insurer to authorize *Moeller* counsel to settle claims on the insurer's behalf. Accordingly, given the absence of legal authority supporting HCSD's proposed counterclaim, the district court acted within its discretion when it rejected HCSD's request for leave to amend.[31]

## VI.

For the reasons set forth above, we AFFIRM the district court's grant of Ace American's motion for summary judgment and REVERSE the district court's grant of Acadia's motion for summary judgment. We therefore REMAND for further proceedings in accordance with this opinion. We also AFFIRM the district court's denial of HCSD's motion for leave to amend.

AFFIRMED in part, and REVERSED and REMANDED in part.

---

[31] *Marucci*, 751 F.3d at 378; *Stripling*, 234 F.3d at 873.

17

Nos. 13-60286 cons. w/13-60481

EDITH BROWN CLEMENT, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that the Ace American Policy covers only employment-related claims and join in Parts I-III and V of the opinion. Because the Cowards' Amended Complaint does not allege an "occurrence" triggering a duty to defend under the Acadia Policy, I dissent from the majority's holding in Part IV that Acadia owes such a duty to HCSD.

I.

As the majority opinion correctly states, an occurrence is triggered only by accidental conduct. *U.S. Fid. & Guar. Co. v. OmniBank*, 812 So. 2d 196, 201 (Miss. 2002).  The majority finds the requisite allegation of accidental conduct in the Amended Complaint's assertion that Johnston "dropped M.L.C."  But the majority completely omits the context in which the purported drop is claimed.  The relevant paragraph of the complaint states:

> In or about the spring of 2008, and for the period of around one year, Louise Miley Johnston, a teacher at Gary Road Intermediate School, engaged in *abusive behavior and other conduct* including, but not limited to, *physical and emotional abuse* of M.L.C.  *For example*, Ms. Johnston sprayed M.L.C. in the face with a can of Aerosol spray and dropped M.L.C.  She also called M.L.C. a 'bitch,' threw a ball at M.L.C. hitting her in the face . . . .  Ms. Johnston also grabbed M.L.C.'s face and told her, 'I hate you, you make me sick.' . . . The *foregoing examples of abuse* by Ms. Johnston against M.L.C. are not exhaustive.

Am. Compl. ¶ 9 (emphases added).  The Cowards' pled Johnston's drop as an *example of abuse* along with other clearly intentional conduct.  Read in context, the Amended Complaint does not allege an accidental drop but claims, as the district court found, that the drop was another act in a sequence of intentionally abusive behavior.  *See Farmland Mut. Ins. Co. v. Scruggs*, 886 So. 2d 714, 719 (Miss. 2004) (no duty to defend where "[f]rom the face of [plaintiff's] complaint, only intentional torts are alleged" and where

"[defendants'] pattern of conduct has been one of intentional acts."). Under the majority's decision, a defendant faced with factual allegations of intentional misconduct can simply suggest that the actions could have instead been the product of negligence and thus trigger an insurer's duty to defend. This now-permissible reinterpretation of a plaintiff's allegations, even if contrary to the language of the complaint, effectively supersedes Mississippi law that an occurrence cannot result from intentional conduct.

The single reference to Johnston's negligence (as opposed to Hinds County's own negligence in failing to identify and prevent Johnston's intentional behavior) in the Amended Complaint appears in Paragraph 13: "Upon information and belief, officials of the school and school district were aware of the negligence and physical and emotional abuse to which M.L.C. was subjected at the hands of Johnston."[1] This conclusory use of the word "negligence" does not transform the character of the factual allegations of intentional conduct against Johnston into allegations of accidental conduct constituting an "occurrence." "Negligence" is not a factual allegation, but a legal conclusion that cannot itself bring a complaint within the scope of an insurance policy's coverage. See *E.E.O.C. v. S. Pub. Co.*, 894 F.2d 785, 790-91 (5th Cir. 1990) ("Under Mississippi's 'allegations of the complaint' rule if the *factual* allegations of the complaint bring the action within coverage of the policy, the insurer has a duty to defend." (emphasis added)); *Emp'rs Reinsurance Corp. v. Martin, Gordon & Jones, Inc.*, 767 F. Supp. 1355, 1359-

---

[1] The Cowards' initial complaint did not allege any negligent conduct at all, but stated that the action was for the "abuse, battery and infliction of emotional distress against M.L.C.," and consistently referred to Johnston's actions as "abuse and battery." It was only after Acadia (and Ace American) refused to provide a defense or indemnify Hinds County that the Cowards filed an Amended Complaint describing Johnston's conduct as negligent. But the Amended Complaint did not contain new *factual* allegations, it merely included the word "negligence."

Nos. 13-60286 cons. w/13-60481

60 (S.D. Miss. 1991) ("[I]t is the facts alleged, not the pleader's legal conclusions, that are relevant to the insurer's duty to defend.").

But even if we ignore the fact that the Amended Complaint alleges only intentional abuse, the "negligent" drop would still not bring the complaint within the terms of the Acadia Policy. The Mississippi Supreme Court permits courts to look to evidence outside of the complaint to determine an insurer's coverage obligations. *See Auto. Ins. Co. of Hartford v. Lipscomb*, 75 So. 3d 557, 560 (Miss. 2011). The drop referred to in the Amended Complaint was described by Larina Mason, another employee of the school district:

> On 9/08/2008 an incident occurred when I asked for assistance to get [M.L.C.] out of her wheelchair and onto a mat on the floor. While I had my back turned putting on gloves, I heard a thud. When I turned around [M.L.C.] was lying on the floor on the mat. *Kourtney (assistant in classroom) had transferred her without any help. She commented*, "She's alright. I'm not going to hurt my back bending over." I did not see *her* drop [M.L.C.] on the mat, but by *her* response and the look on Ms. Johnston's face and the look on [M.L.C.]'s face, I know she didn't transfer her appropriately.

Statement of Larina Mason ¶ 1 (emphases added). The majority concludes that Mason's statement is "ambiguous" and engages in a tortured reading of the paragraph to cast uncertainty as to whom the pronouns "her" and "she" refer. This is unconvincing because Mason's statement clearly explains that Kourtney—not Johnston—transferred M.L.C.[2] The next sentence states that "she"—Kourtney, the subject of the preceding sentence—declared that she would not "hurt [her] backing bending over."[3] Mason then states that she "did

---

[2] The majority also states that the Cowards understood that Johnston, not Kourtney, dropped M.L.C. This is incorrect. In their response to Acadia's interrogatory concerning the drop, the Cowards stated: "We do not know whether the incident where M.L.C. was dropped was intentional or not. The only information we have on the incident is . . . the statement of Larina Mason on April 2, 2009."

[3] While it is unclear whether Kourtney meant that she had dropped M.L.C. because she did not want to hurt her back, or whether she meant that she was not going to pick her up off the mat because doing so would hurt her back, it is clear that Kourtney is the speaker.

not see her drop [M.L.C.] on the mat, but by her response and the look on Ms. Johnston's face . . . I know she didn't transfer her appropriately." Again, Mason's use of a pronoun refers to Kourtney. Kourtney is not only the subject of the previous sentence, but is identified as the sole transferor of M.L.C., and thus the only person to whom Mason could be referring when she states that she did not "see her" drop M.L.C. Because Johnston is identified by name in the sentence, the majority's contention that Johnston could also be the "her" that Mason describes as having dropped M.L.C. is simply untenable. Replacing Johnston's name with the pronoun "her" would read this way: "I did not see [Johnston] drop M.L.C. on the mat, but by [Johnston's] response, and the look on Ms. Johnston's face . . . I know she didn't transfer her appropriately." Mason's use of the pronoun "her" clearly refers to Kourtney— the person whom Mason describes as dropping M.L.C.—not Johnston, who witnessed the action and, from Mason's description, presumably displayed some sort of shock indicating that Kourtney improperly transferred M.L.C.

The majority, in a footnote, concludes that even if it was Kourtney and not Johnston who dropped M.L.C., the Acadia Policy would still be triggered because "HCSD is potentially liable under the same agency theory invoked by the Coward family as to Johnston." Where a plaintiff is seeking to hold an employer liable for the conduct of an employee, it is the employee's conduct that determines whether there has been an "occurrence" triggering coverage of the liability insurer. *See Am. Guarantee & Liab. Ins. Co. v. 1906 Co.*, 129 F.3d 802, 810 (5th Cir. 1997) ("[T]he 'ultimate question' for coverage purposes is whether the employee's intentional misconduct itself falls within the definition of an occurrence."). Thus, it is the conduct of Johnston, not HCSD, which determines whether there has been a "bodily injury" caused by an "occurrence" triggering Acadia's coverage obligations.

21

But the Cowards do not allege that HCSD is liable for any *negligent* conduct by Johnston under a theory of respondeat superior. The Cowards allege claims of: (1) conspiracy; (2) breach of fiduciary duty; (3) intentional or negligent infliction of emotional distress; (4) negligence; (5) negligent supervision, assignment, hiring, and retention; (6) negligent misrepresentation; (7) and deprivation of constitutional rights under 42 U.S.C. § 1983. Every claim is predicated on Johnston's *intentional* abuse of M.L.C. The Cowards' negligence claim asserts that HCSD and individual defendant officials of the school breached their duty of care to M.L.C.

> by negligently failing to act as reasonable and prudent teachers and school administrators . . . Specifically, Kourtney Parnell failed to timely report Johnston's *mental and physical abuse* of M.L.C., thereby causing a delay in appropriate response to the wrongful conduct. Once the conduct was reported to defendants, they failed to take appropriate action to protect the rights of Plaintiffs under the laws of Mississippi and the United States.

Am. Compl. ¶ 44 (emphasis added).

Neither Kourtney Parnell nor any other non-administrative employee is named as a defendant in the lawsuit. The Cowards seek to impute the "negligence of the teachers, administrative employees and agents of [HCSD]" to the school district under the doctrine of respondeat superior. Am. Compl. ¶ 47. But, contrary to the majority's contention, the Cowards do not claim that HCSD is vicariously liable for an unintentional tort—such as a negligent drop—committed by Johnston (most likely because, as discussed above, none is alleged). The negligence claim asserted in the Amended Complaint is that HCSD is responsible for its teachers' and administrators' failure to report Johnston's *intentional abuse* and for failing to stop the abuse once they were

aware of it.[4]  Neither committing intentional abuse, nor failing to report such abuse, is an "accident" constituting an occurrence under the policy.

The only other language in the Amended Complaint that could possibly give rise to the majority's reading of a general "agency theory" asserting HCSD's liability for an accidental act by Johnston is the reference to respondeat superior in the Cowards' breach of fiduciary duty claim.  This paragraph alleges that

> [t]he *abuses and assaults* in this case arose from Ms. Johnston's exercise of authority, power, and access created by her position and employment as a teacher for the Defendants.  Plaintiffs thus plead vicarious liability under the doctrine of respondeat superior and/or ratification in that the Defendants *knew or should have known of the dangerous propensities of Ms. Johnston* and could foresee Ms. Johnston's actions as arising from the duties of Ms. Johnston as a teacher of the Defendants.

*Id.* ¶ 35 (emphases added).  Again, it is clear that the "agency theory" asserted here is that HCSD is liable for its administrators' failure to prevent Johnston's intentional conduct.  All of the Cowards' claims are premised on HCSD's failure to uncover, warn, and stop Johnston's intentional abuse of M.L.C.  The Cowards simply do not claim that HCSD is liable for any unintentional torts of Johnston and thus there is no support for the majority's position that Kourtney Parnell's "accidental" drop of M.L.C. could bring the Cowards' action within the scope of Acadia's coverage.  *See Scruggs*, 886 So. 2d at 719 ("A liability insurance company has an absolute duty to defend a complaint which contains allegations covered by the language of the policy, but it has absolutely no duty to defend those claims which fall outside the coverage of the policy.").

---

[4] Likewise, the Cowards' negligent supervision and hiring claim alleges that defendants "negligently failed to warn Plaintiffs, their family, or any of the pupils' parents of Ms. Johnston's *dangerous propensities* despite knowledge of these propensities." Am. Compl. ¶ 49 (emphasis added).

Nos. 13-60286 cons. w/13-60481

Because the Amended Complaint does not allege accidental conduct by Johnston constituting an "occurrence" and all of the Cowards' claims are premised on Johnston's intentional abuse of M.L.C., I would affirm the district court's ruling that Acadia has no duty to defend HCSD.

## II.

Because the Cowards' causes of action against Hinds County do not premise liability on accidental conduct of Johnston that could trigger coverage under the Acadia Policy, the district court's grant of summary judgment on Acadia's claim that it has no duty to indemnify HCSD should also be affirmed. It is true that the "duty to indemnify generally cannot be ascertained until the completion of litigation, when liability is established, if at all."[5] *State Farm Mut. Auto. Ins. Co. v. LogistiCare Solutions, LLC*, 751 F.3d 684, 692 (5th Cir. 2014) (internal quotation marks omitted). This is because the duty "turns on the actual facts giving rise to liability in the underlying suit, and whether any damages caused by the insured and later proven at trial are covered by the policy." *Id.* (internal quotation marks omitted). But as any liability on the part of HCSD must necessarily be premised on the intentional abuse inflicted by Johnston as alleged in the Amended Complaint, there is no set of facts that could bring HCSD's liability within the Acadia Policy's coverage. Accordingly,

---

[5] Mississippi federal district courts have consistently held that "because the duty to defend is broader than the duty to indemnify, where there is no duty to defend, there is no duty to indemnify." *Haney v. Cont'l Cas. Co.*, No. 08-482, 2010 WL 235025, at \*2 (S.D. Miss. Jan. 15, 2010); *see also Tudor Ins. Co. v. Manchester Educ. Found., Inc.*, 10-493, 2013 WL 228023, at \*2 (S.D. Miss. Jan. 22, 2013) (same); *Coleman v. Acceptance Indem. Ins. Co.*, 08-260, 2009 WL 1873742, at \*6 (S.D. Miss. June 29, 2009), *aff'd*, 369 F. App'x 595 (5th Cir. 2010) (same); *Evanston Ins. Co. v. Neshoba Cnty. Fair Ass'n, Inc.*, 442 F.Supp.2d 344, 346 n. 1 (S.D.Miss.2006) (same). This court has not established such a "per se rule." *Coleman*, 369 F. App'x at 598.

Nos. 13-60286 cons. w/13-60481

I would also affirm the district court's grant of summary judgment that Acadia has no duty to indemnify HCSD.[6]

I respectfully dissent.

---

[6] Shortly after the instant appeal was taken, the district court dismissed all of the Cowards' claims except for their § 1983 claim. There is no plausible argument that the Acadia Policy's coverage for *accidental* conduct could encompass any set of facts establishing the denial of M.L.C.'s asserted constitutional right to bodily integrity.